453 So.2d 165 (1984)
BARNACLE BILL's SEAFOOD GALLEY, INC., Appellant/Cross-Appellee,
v.
Larry R. FORD, Appellee/Cross-Appellant.
No. AW-21.
District Court of Appeal of Florida, First District.
July 19, 1984.
C. LeDon Anchors of Estergren, Fortune, Anchors & Powell, Fort Walton, for appellant/cross-appellee.
Charles A. Wade, Crestview, for appellee/cross-appellant.
BOOTH, Judge.
This cause is before us on appeal from a final judgment canceling a lease agreement, and on cross appeal from a summary judgment based on res judicata.
The Okaloosa Island Authority[1] leased two lots to Larry R. Ford for 99 years. In 1972, Ford subleased the two lots, along with the building on them, to Mitchel Benaquis *166 and Ruth Puhalla Kondrat, who in turn assigned the sublease to Barnacle Bill's Seafood Galley, Inc. The relevant terms of the lease are as follows: (1) Barnacle Bill's was to pay rent of $600 per month to Ford for ten years; (2) Barnacle Bill's had the option to renew the lease for another ten years at $750 per month; (3) two percent of Barnacle Bill's gross revenue from operation of its restaurant on the property was to be paid directly to the Okaloosa Island Authority each month.
The sublease from Ford, as originally drafted, required the two percent assessment on the gross revenues from the operation of the restaurant to be paid directly to Ford. However, the Island Authority would not approve the sublease unless the two percent assessment was made payable directly to the Island Authority, and the change was accordingly made in the lease to obtain the Island Authority's approval.
On June 23, 1975, the Okaloosa Island Authority was abolished, and all its powers, duties, and functions were given to the County Commissioners of Okaloosa County. Chapter 75-456, Laws of Florida. The County Commissioners were not given the power to collect the two percent assessment on gross revenue, and Barnacle Bill's ceased paying the assessment. The County did, however, impose an ad valorem tax on the leased property in 1975. Barnacle Bill's did not pay this tax, nor did Ford.[2] Years of litigation determined that the County Commission had the power to impose such a tax.
Also in 1975, Barnacle Bill's filed suit asking that Ford be required, pursuant to the lease, to repair the leased building, which was damaged by a storm. Ford filed a counterclaim for cancellation of the lease, in part alleging that Barnacle Bill's breached the lease agreement by discontinuing payment of the two percent assessment and by not paying the ad valorem tax. This part of the counterclaim was dismissed on Barnacle Bill's motion, which asserted that Ford was not the proper party to claim unjust enrichment resulting from non-payment of assessment and taxes. Ford subsequently appealed all issues in the case except dismissal of the counterclaim, and the First District Court of Appeal affirmed. Ford v. Barnacle Bill's Seafood Galley, Inc., 350 So.2d 838 (Fla. 1st DCA 1977).
On April 20, 1981, Ford brought this action for declaratory relief, again pleading in part that the non-payment of the assessment/tax was a breach, and also the lease was unjust and unfair. Barnacle Bill's contended it was not liable for the two percent assessment because the Okaloosa Island Authority no longer existed and was not liable for ad valorem taxes since this was not provided under the lease. Barnacle Bill's denies the lease was unjust and unfair.
In November of 1981, the trial judge granted Barnacle Bill's motion for summary judgment on the "non-payment of assessment as breach" section of the complaint, relying on the doctrine of res judicata.[3] In November of 1983, the trial court entered final judgment canceling the lease based on a finding that there would be a substantial windfall to Barnacle Bill's if the lease were to be enforced and the court's determination that the minds of the parties *167 never met under actual existing conditions.[4]
On appeal, the two principal issues argued were (1) whether it was error to cancel the lease, a cancellation apparently based on the theory of mutual mistake argued below, the "mistake" being belief in the continued existence of the Island Authority, and (2) whether the doctrine of res judicata is properly applicable here.
The first issue is answered in the affirmative. The doctrine of mutual mistake is not applicable under the facts here since, by definition, the mutual mistake of fact must be of a fact existing at the time of the contract and not as to a future event.[5] The abolition of the Okaloosa Island Authority occurred years after the contract was entered into. Any erroneous beliefs as to the future existence of the Authority was not mistake of fact.
As to the second issue, summary judgment based on res judicata should not have been granted. There being no clear and convincing evidence that the merits of the former case were considered in the dismissal of Ford's counterclaim, the 1976 judgment relied on as a basis for the res judicata ruling was not a decision on the merits. Res judicata therefore does not apply.
Accordingly, both the final judgment and the summary judgment entered below are reversed. Both parties agree that entry of the summary judgment based on res judicata precluded consideration of other matters asserted by Ford. Therefore, on remand, the trial court may consider reformation of the lease or cancellation of the renewal option based on an alleged breach of the agreement. The trial court, based on appropriate findings, may reform the lease and under a theory of partial impossibility or partial impracticability[6] resulting from the abolition of the Island Authority, may order payment to Ford of the percentage assessment formerly payable by Barnacle Bill's to the Island Authority or such other relief as may be appropriate.
*168 Accordingly, the cause is reversed and remanded.
ERVIN, C.J., and WENTWORTH, J., concur.
NOTES
[1] Created under Chapter 29336, Laws of Florida 1953.
[2] Still pending in the Circuit Court, Okaloosa County, is a suit filed by Stokes, Tax Collector of Okaloosa County, against Larry Ford to recover from Ford the ad valorem taxes due for the years 1975 through 1979. A partial summary judgment was entered in that suit in 1981 in favor of the tax collector and against Ford in the amount of $8,765.97. Still pending is the claim of Ford, as third party plaintiff, against Barnacle Bill's, as third party defendant, requesting reformation of the lease and seeking recovery from Barnacle Bill's of taxes found payable.
[3] Trial court's order of November 23, 1981:

The Court finds that all issues relating to the payment of ad valorem taxes raised in the pending lawsuit were the same issues and facts raised in Case No. 75-2112, that the same persons and parties to that action were parties to the present action, all of which claims were dismissed by the Circuit Judge in Civil Action No. 75-2112, ... .
[4] Trial court's final judgment of October 20, 1983:

That because of the circumstances having changed so since the parties entered into their agreement  which included the renewal clause which is the provision in issue  the Defendant, BARNACLE BILL'S SEAFOOD GALLEY, INC., would receive a substantial windfall if the lease were enforced.
Neither party intended the present result when they contracted, and in reality, the minds of the parties have never met under the actual existing conditions.
[5] Beals v. Tri B Associates, 644 P.2d 78 (Colo. App. 1982); Shear v. National Rifle Association of America, 606 F.2d 1251 (D.C. Cir.1979); United States v. Garland, 122 F.2d 118 (4th Cir.1941). Restatement (Second) of Contracts § 151 Comment (1979):

[T]he erroneous belief must relate to the facts as they exist at the time of the making of the contract. A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a "mistake" as that word is defined here.
[6] Restatement of Contracts § 463 (1932); Restatement (Second) of Contracts § 270 (1979):

Partial Impracticability
Where only part of an obligor's performance is impracticable, his duty to render the remaining part is unaffected if
(a) it is still practicable for him to render performance that is substantial, taking account of any reasonable substitute performance that he is under a duty to render; or
(b) the obligee, within a reasonable time, agrees to render any remaining performance in full and to allow the obligor to retain any performance that has already been rendered.
... .
Illustrations:
... .
2. A contracts with B to deliver all of B's requirements of milk during the following year at B's loading platform at 200 Lincoln Street. Before A begins performance, the loading platform is accidentally destroyed by fire, but B has an equally suitable platform across the street at 201 Lincoln Street. Neither A's nor B's duties are affected, except that A is to deliver and B is to accept milk at 201 Lincoln Street.
3. A contracts to sell and B to buy a quantity of wheat "f.o.b. Kosmos Streamer at Seattle." Before delivery, an outbreak of war makes Kosmos line ships unavailable at Seattle, but delivery on that line's loading dock remains possible and is a commercially reasonable substitute. Neither A's nor B's duties are affected, except that A is to deliver and B is to accept wheat at the Kosmos line's loading dock. B may have a claim under the rules stated in § 272(1) based on A's failure to load the wheat for which he has been paid.